James F. CURLEY, Plaintiff,

v.

ST. JOHN'S UNIVERSITY, Defendant.

No. 97 Civ. 4450 (CBM).

United States District Court,
S.D. New York.

Oct. 7, 1998.

Lee Nuwesra, New York, NY, for plaintiff.

Orrick, Herrington & Sutcliffe, LLP, Ruth Raisfeld, Rene A. Kathawala, New York, NY, for defendant.

*OPINION DENYING SUMMARY JUDGMENT*

MOTLEY, District Judge.

**OPINION**

Plaintiff James F. Curley sued his employer, defendant St. John's University ("University"), claiming that his new assignment to teach undergraduate rather than graduate courses in the fall of 1996 constituted age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, the New York State Human Rights Law ("State HRL"), *N.Y.Exec.L.* § 290 *et seq.*, and the New York City Human Rights Ordinance ("City HRO"), *N.Y. City Admin.Code* § 8-101 *et seq.* The University moved for summary judgment under Fed.R.Civ.Proc. 56. The motion is denied because, for the reasons given below, a reasonable fact finder could conclude that the change in Dr. Curley's teaching assignment was a material adverse employment action and that age was a motivating factor in the University's decision to take that action.

**I. BACKGROUND**

**A. Undisputed Facts**

Dr. James F. Curley is a tenured professor in the Department of Psychology ("Department") in the University's academic unit, St. John's College of Liberal Arts and Sciences ("College"). As of July 23, 1998, Dr. Curley was 62 years old. Initially hired by the University as an Assistant Professor of Psychology in 1973, Dr. Curley was given tenure in 1978. Dr. Curley has not supervised a dissertation since 1988, has not requested any research grants recently, and with the exception of a two-page newsletter has not published since 1990. *See* Def.Ex. 5; Tr. Summ.J. Hr'g (hereinafter, "Tr.") 53–56. All University faculty, except those at the law school, are represented by a labor organization, the St. John's chapter of the American Association of University Professors—Faculty Association at St. John's University (the "Faculty Union"), and have signed a collective bargaining agreement. *See* Def.Ex. 2.

Dr. Raymond DiGiuseppe is a tenured Department faculty member and is Director of the Graduate School Psychology Program ("Program"). The Program now offers a Master of Science degree, having discontinued its doctoral program in or around 1984. Until September 1987, when Dr. DiGiuseppe was hired as a faculty member and Director of the Program, Dr. Curley was the only Department faculty member who had been assigned core School Psychology courses. In February 1996, the University submitted a proposal to the New York State Education Department for approval of a Psy.D. doctoral degree program in School Psychology.

In the spring of 1996, Dr. Curley requested to teach three graduate courses in the fall 1996 semester: Psychology 715, Psychology 726, and Psychology 752. Each semester, the preliminary teaching schedule at the University is considered by the Personnel & Budget Committee ("P & B Committee"), a peer review committee composed solely of the Department Chair and four elected faculty members. The P & B Committee recommends a teaching schedule to the Dean of the College. The graduate teaching schedule is also reviewed by the Dean of the Graduate School of Arts and Sciences. The members of the P & B Committee in 1996 were Dr. Raymond DiGiuseppe (then age 47), Dr. Jeffrey Fagen (then age 47), Dr. John Hogan (then age 45), Dr. Jeffrey Nevid (then age 45), and Dr. Alice Powers (then age 52).

Dr. DiGiuseppe submitted to the P & B Committee a memorandum, dated June 13, 1996, summarizing complaints he reported that he received about Dr. Curley's teaching and academic credentials. *See* Def.Ex. 13. On or about June 18, 1996, Dr. Curley received a copy of the memo and a copy of letters written by graduate students criticizing his graduate teaching. In response, Dr. Curley gave the P & B Committee his own memorandum, dated June 28, 1996. *See* Def .Ex. 16. On July 11, 1996, Dr. Curley spoke at the meeting of the P & B Committee and distributed to it a package consisting of the first page of articles Dr. Curley gave

students in his classes. *See* Def.Ex. 17. Dr. Curley did not mention age discrimination at the meeting.

On July 15, 1996, the P & B Committee unanimously recommended a teaching schedule to the Dean of the College that assigned Dr. Curley to teach only undergraduate classes in the fall 1996 semester. The Dean accepted this recommendation. Dr. Curley received notification of this decision by letter dated July 15, 1996 and did not file a grievance challenging it. In the fall 1996 semester, the faculty who taught the graduate courses Dr. Curley had requested, Psychology 715, Psychology 726, and Psychology 752, were Dr. Lynne Thies (then age 46), Dr. Helen Stevens (then age 46), and Dr. Joseph Teta (then age 48), respectively.

In a memorandum dated June 27, 1996, Dr. James Fagen and Dr. DiGiuseppe wrote to the Dean of Faculty, Reverend David O'Connell, in order to "bring to [his] attention several serious concerns [they] had about the behavior of Dr. James Curley." Pl.Ex. M. The Dean reports that he kept this letter in Dr. Curley's file but did not otherwise act on it:

> As you are undoubtedly aware, the Psychology Department Personnel & Budget Committee is currently reviewing several complaints against Dr. Curley from current and former students in the graduate program in school psychology, as well as from externship and internship supervisors connected with this program. These complaints deal with the ability of Dr. Curley to effectively teach graduate courses in school psychology. The Committee intends to determine whether to continue to assign graduate courses to Dr. Curley. The material presented below is separate from that issue and, we believe, raises serious questions about whether Dr. Curley should be permitted to continue as a faculty member at the University. We have grouped the instances of unprofessional behavior on the part of Dr. Curley into three categories: Unprofessional Conduct with Faculty, Unprofessional Conduct with Graduate Assistants, and Unprofessional Conduct with Other Graduate Students. *Id.*

## B. Disputed Facts

### 1. The University's Case

As evidence of Dr. Curley's unsatisfactory performance, the University offers the following complaints about Dr. Curley. First, experts in the field from outside the University criticized his work. Academic experts evaluating the University's prospects for approval of a doctoral program found his credentials substandard, writing that his "record of academic scholarship would be judged below expectations for faculty at his rank and years of experience." Def.Ex. 12, at C1126. School psychologists from at least eight Nassau County schools who supervised Dr. Curley's graduate students complained that they had to teach those students basic skills that Dr. Curley should have taught them. *See* Def.Ex. 13, at C39–40.

Second, numerous graduate students voiced various criticisms of Dr. Curley's teaching. In letters to Dr. DiGiuseppe, they complained that Dr. Curley: "arrived late to every single class session," Def. Notice Mot. Summ.J., Bologna Aff., Ex. 1; "spent two hours filling us in on his opinion of current events" rather than cover syllabus material, *id.;* cut classes short and "warned his students not to complain" about it, Def. Notice Mot.Summ.J., Boyce Aff., Ex. 1; "rarely provided students with recent literature," Def. Ex. 38, Casale Letter; and failed to teach students adequately how to administer, score, or interpret personality tests, *see* Def. Notice Mot.Summ.J., MacEwan Aff., Ex. 1. There also were criticisms from graduate assistants, *see* Tr. 65, and undergraduate students, *see* Def.Ex. 14.

Third, faculty members complained that Dr. Curley's was ineffective as a core course instructor, signed off on incorrect diagnoses prepared by his students, and allowed students to make errors in scoring tests in clinical settings. *See* Def.Exs. 7, 8, 13. In a letter to Dr. Curley informing him of the teaching assignment change, Dr. Jeffrey Fagen, a professor who chaired the Department and served on the P & B Committee, closed by writing:

You have played a major role in school psychology at St. John's University for many years. The committee regrets having to take the action we have taken. However, we have concluded that the educational, ethical, and legal implications are so overpowering, we have no choice. Def. Ex. 18.

These shortcomings were legitimate grounds for action, the University contends, because the collective bargaining agreement requires Dr. Curley "to be an effective teacher and scholar." Def.Ex. 2 ¶ 10.4(b). More specifically, the agreement provides that "[t]he faculty member recognizes that effective teaching requires continued research as well as continued improvement of pedagogical methods." Id. ¶ 10.4(c). Alteration of Dr. Curley's course load was an appropriate response to his failure to meet these standards adequately, the University asserts.

The allegedly discriminatory statements by Dr. DiGiuseppe, the University argues, are immaterial for two reasons. First, the statements do not reflect age animus. Rather, they are a combination of harmless comments and criticisms of Dr. Curley that focus on his shortcomings, not his age. Second, any discriminatory comments by Dr. DiGiuseppe are mere stray remarks. A faculty peer of Dr. Curley with a very limited role in any University actions, Dr. DiGiuseppe is not enough of a decision-maker for his comments to show University motives. Rather, Dr. DiGiuseppe is only a "peer" of Dr. Curley, Tr. 31, while "the dean makes the final decision[, s]o it is the dean who is the decision-maker," Tr. 63.

### 2. Dr. Curley's Case

Dr. Curley argues that the change in his teaching assignments was adverse because "graduate professors are held in higher esteem, ... get better paying jobs," and teach fewer and less favorable hours than undergraduate professors. Tr. 14. Dr. Sharon-ann Gopaul–McNicol, a full-time Assistant Professor of Psychology in the Program from 1993 to 1996, concurs:

There is no question that full time professional academicians, including myself, distinguish between teaching at the graduate level versus teaching at the undergraduate level. Professionally, when a faculty member teaches graduate courses, he/she is better recognized in the profession, which can lead to better career and consultation employment opportunities.... [R]emoving a faculty member from graduate courses and assigning him/her to exclusively teach undergraduate courses was considered as a disciplinary punishment. Pl.Ex. G ¶ 17.

The substance of the work also differs in a manner relevant to Dr. Curley's field of expertise. "At St. John's you can only teach 'School Psychology' at the graduate level." Id.

As support for his allegation of age-based animus in the University's decision-making, Dr. Curley offers his deposition and the affidavit of Dr. Gopaul–McNicol. Dr. Curley stated in his deposition that Dr. DiGiuseppe asked whether Dr. Curley was going to "stick around" after his sixtieth birthday, queried "why would you want to stay around here after you are 60?," and opined that "when you hit the big 60 you are over the hill." Pl.Ex. I, at 338, 351, 353. Dr. Curley claims that age bias led the University to seek his retirement by worsening his schedule.

Dr. Gopaul–McNicol agreed with Dr. Curley:

[T]here was age animosity directed toward older/senior faculty at the Psychology Department by the Administration. In 1994, the Chairman, Dr. Fagen, discouraged me from socializing with older/senior faculty. I observed that older faculty members were shunned by the Administration. On many occasions, Dr. DiGiuseppe would refer to Dr. Curley's age, pointing out that he could write about the history of the School Psychology, since Dr. Curley was there from the beginning (The School Psychology Program was created over seventy years ago). Pl.Ex. G ¶ 13.

In discussing two job applicants with her over lunch in March 1996, Dr. DiGiuseppe said

that he wished that Dr. Curley was dead, so that he could offer the positions to both younger candidates.... On other occasions, Dr. DiGiuseppe told me that he

wished the 'University' had retirement age at 60, so Dr. Curley would retire. This would allow him to replace him with a younger faculty member. Pl.Ex. G ¶ 14. Dr. Gopaul–McNicol further claimed that Dr. DiGiuseppe and others falsely asserted that she was a witness to unprofessional conduct by Dr. Curley. *See* Pl.Ex. G ¶ 16.

Dr. Curley argues that Dr. DiGiuseppe was a decision-maker whose views infected the decision-making process. While Dr. Di-Giuseppe was a faculty member covered by the same collective bargaining agreement as Dr. Curley, the University explained that under that agreement, "deans ... share their authority for administering the school with faculty peer review committees," including the P & B Committee. Tr. 31–32. On the committee, Dr. DiGiuseppe served with Dr. Fagen, who was Dr. Curley's "supervisor" as Department Chair. The University reported that it "has faculty chair people who, despite their cloak of managerial authority, are still members of the collective bargaining agreement. They are sort of quasi-managerial. But the chair is a faculty member with supervisory authority over ... course assignments." Tr. 31.

Dr. Curley also defends his qualifications with Dr. Gopaul–McNicol's evaluation:

> I found Dr. Curley to be an experienced and a visionary faculty member, who was an effective teacher ... [and] competent as a Scientist and as a Practitioner. I was impressed to find that he was so up-to-date on the latest studies and documented research. In 1996, 1 reviewed his syllabus and found it to be updated with relevant school psychology literature. Pl.Ex. G ¶¶ 7, 9

Furthermore, Dr. Curley, unlike some Department faculty, was a licensed psychologist, a valued teaching criterion according to the American Psychology Association. *See* Pl. Ex. G ¶ 10.

Six students of Dr. Curley submitted affidavits defending his teaching. *See* Pl.Ex. H. Typical among the six is the praise of Dr. Curley's teaching from Joseph DiPalo, a practicing school psychologist who took many classes from Dr. Curley, including in fall 1995:

> I found Dr. Curley to be well qualified to teach this course as well as all of his other courses. His teaching of Child Adolescent Personality Assessment I, has proven to be insightful and invaluable.... I found Dr. Curley to be well prepared for his classes. During class, Dr. Curley discussed up-to-date, important and relevant topics.... He always listened to his students' concerns and attempted to accommodate their needs. Pl.Ex. H, Aff. Joseph DiPalo ¶¶ 2, 3.

Dr. Curley also drew positive evaluations of his work teaching students to conduct tests. *See, e.g., id.* ¶ 4. Two schools where Dr. Curley's students tested children wrote to Dr. Curley to compliment his graduate students' testing work; one requested that Dr. Curley have his students work for more of the school year in the future. *See* Pl.Ex. Q.

As for Dr. Curley's scholarly work, Dr. Curley points to a May 1997 letter from Dr. P.B. Ammons, the editor of *Perceptual & Motor Skills*, an academic journal. *See* Pl. Ex. P. Dr. Ammons wrote to Dr. Curley that because he had published with them previously in 1990,

> and because we note that you have been doing a good deal of research over a period of time, we would like to remind you that we agreed to allow you at some time in the future to publish a note.... We hope that you have some data which you would like to present. *Id.*

## II. CONCLUSIONS OF LAW

### A. Applicable Legal Standards

#### 1. Summary Judgment Standards

The basic rule in deciding on a Fed. R.Civ.P. 56 summary judgment motion is that "[u]ncertainty as to the true state of any material fact defeats the motion." *Gibson v. Am. Broad. Co.*, 892 F.2d 1128, 1132 (2d Cir.1989). The non-moving party's burden is to produce concrete evidence sufficient to establish a genuine unresolved material issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.

1988). The court then must view the facts in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir.1994). The court neither weighs the evidence nor resolves material factual issues, but only determines whether, after adequate discovery, any such issues remain unresolved because a reasonable fact finder could decide for either party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Gibson*, 892 F.2d at 1132.

In discrimination cases, because the issue of the employer's hidden intent is so salient, the Second Circuit has emphasized that trial courts must be especially chary about disposing of claims on summary judgment. *See, e.g., Gallo*, 22 F.3d at 1224; *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 103 (2d Cir.1989). "Since it is rare indeed to find in an employer's records proof that a personnel decision was made for a discriminatory reason, whatever other relevant depositions, affidavits and materials are before the district court must be carefully scrutinized for circumstantial evidence that could support an inference of discrimination." *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir.1996); *see also Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994). This does not mean that plaintiff's summary judgment burden is lower in discrimination cases. It just reflects the reality that discrimination cases are often the sort in which, because they turn on murky issues of intent and inference, plaintiffs need witness testimony and full argument to meet their burdens of proof.

## 2. Age Discrimination Standards

■ The same analysis applies to discrimination suits under Title VII, the ADEA, the State HRL, and the City HRO. *See Lightfoot v. Union Carbide Corp.*, 110 F.3d 898 (2d Cir.1997) (Title VII, ADEA, State HRL); *Sutera v. Schering Corp.*, 73 F.3d 13, 16 n. 2 (2d Cir.1995) (ADEA, State HRL, City HRO). Cases tend to distinguish among "pretext" and "mixed-motive" showings,

which both apply to the ADEA. *See Raskin v. Wyatt Co.*, 125 F.3d 55 (2d Cir.1997).

### a. "Pretext" Analysis

When plaintiffs attempt to prove the employer's defense a pretext for discrimination, courts traditionally "use the familiar burden-shifting framework first articulated in *McDonnell Douglas.*" *Raskin*, 125 F.3d at 59 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Plaintiff first must prove by a preponderance of the evidence the four elements of a prima facie case of age discrimination: (1) membership in the protected age group; (2) qualification for the position; (3) a material adverse employment decision; and (4) circumstances giving rise to an inference of discrimination. *See Austin v. Ford Models*, 149 F.3d 148 (2d Cir.1998). The prima facie case is only a flexible framework for examining the preliminary requirements plaintiffs face, however. *See McDonnell Douglas*, 802 n. 13, 93 S.Ct. 1817 ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations."). Accordingly, plaintiff's burden is minimal and the inference of discrimination the prima facie showing creates may be insufficient for an ultimate finding of discrimination. *See Fisher v. Vassar College*, 114 F.3d 1332, 1335–37 (2d Cir.1997).

Once plaintiff has established a prima facie case, defendant faces a burden of production " 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' " *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citation omitted); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (defendant "must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action"). Plaintiff then must have an opportunity to meet the burden of persuading the fact finder that the reasons articulated for the adverse deci-

sion were a pretext for discrimination and that age truly motivated the decision. *See St. Mary's,* 509 U.S. at 507–08, 113 S.Ct. 2742; *Burdine,* 450 U.S. at 256–57, 101 S.Ct. 1089; *Fisher,* 114 F.3d 1332. At this final stage, the *McDonnell Douglas* framework "simply drops out of the picture," *St. Mary's,* 509 U.S. at 510–11, 113 S.Ct. 2742, and "the presumption of discrimination that was raised upon a showing of the prima facie case no longer operates." *Fisher,* 114 F.3d at 1336.

### b. "Mixed–Motive" Analysis

In contrast, when plaintiffs argue a mix of discriminatory and nondiscriminatory motives, courts traditionally "use the different analysis set out in *Price Waterhouse v. Hopkins:* if the plaintiff established that a prohibited discriminatory factor played a 'motivating part' in a challenged employment decision, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway." *Raskin,* 125 F.3d at 59 (citations omitted); *see also Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998).

The Civil Rights Act of 1991 ("1991 Act") modified the basic *Price Waterhouse* analysis in critical ways. A plaintiff now must show only that discrimination was a motivating factor in, not the but-for cause of, the adverse decision. "[A]n unlawful employment practice is established when the complaining party demonstrates that [discrimination] . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m); *see also, e.g., Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities,* 115 F.3d 116, 120 (2d Cir.1997). Because discrimination need not be a but-for cause of the adverse action for liability to attach, a defense showing that it would have taken the same action for legitimate reasons "no longer provides insulation to the employer from all liability, but only limits the relief to which the plaintiff is entitled." *Fields,* 115 F.3d at 123. Such a showing may limit plaintiff's relief to equitable remedies and attorney's fees and costs, but leaves plaintiff the prevailing party. *See* 42 U.S.C. § 2000e–5(g)(2)(B). By broaden-ing liability for actions partially motivated by discrimination, the 1991 Act "overrule[d] the part of *Price Waterhouse* that allowed an employer to avoid all liability by prevailing on its dual motivation defense." *Fields,* 115 F.3d at 124 (citing legislative history).

### c. "Motivating Factor" Analysis in All Cases

Overall, the 1991 Act has erased the key distinctions between parties' burdens in "pretext" and "mixed-motive" analyses. In "pretext" analysis, a plaintiff now must prove only that discrimination was "a motivating factor" in the adverse action because the 1991 Act's motivating factor standard applies to *all* discrimination cases, not just to cases in the judicially-created "mixed-motive" sub-category. *See Norton v. Sam's Club, et al.,* 145 F.3d 114, 118 (2d Cir.1998) (holding that plaintiff's burden in pretext analysis is to "adduce sufficient evidence to allow a rational fact finder to infer that the employer was motivated in whole or in part by age discrimination"); *Danzer,* 151 F.3d at 54 (reversing summary judgment for ADEA defendant because of "evidence from which a rational trier of fact could infer that age was a motivating factor in Danzer's dismissal, either under the burden-shifting framework of *McDonnell Douglas* . . . or the mixed-motive framework of *Price Waterhouse* "); *Sutera v. Schering Corp.,* 73 F.3d 13, 17 (2d Cir.1995) (holding that in pretext analysis, " 'plaintiff is not required to show that the employer's proffered reasons were false or played *no* role in the employment decision, but *only that they were not the only reasons* and that the prohibited factor was at least one of the "motivating" factors' " (emphasis added) (citation omitted)).

In "mixed-motive" analysis, because the employer's defense that it would have taken the adverse action for legitimate reasons only goes to relief, it no longer shifts the ultimate burden of persuasion. Also, because the motivating factor standard applies to all cases, "a plaintiff may carry his burden of proving that a forbidden factor was a motive in his termination through either direct or circumstantial evidence," even if only some evidentiary showings merit spe-

cial mixed-motive jury instructions. *See Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir.1997) (citing *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 181–82 (2d Cir.1992)). Just as in pretext analysis, a plaintiff alleging a mix of motives retains the ultimate burden of persuasion and can use any competent evidence to meet that burden.

■ The elimination of meaningful difference between "pretext" and "mixed-motive" has unified discrimination law analysis. In any case, plaintiff argues that discrimination motivated defendant; defendant counters that it had nondiscriminatory motivations. The fact finder has three options. First, it can find liability because plaintiff has proven that defendant's asserted motivations are pretexts for its discriminatory true motives. Second, it can find liability because plaintiff has proven that defendant acted on both discriminatory and nondiscriminatory motivations. Third, it can find no liability because plaintiff has failed to prove that discrimination was at least a motivating factor in defendant's action.

"Pretext" and "mixed-motive" thus are not two kinds of cases, but two kinds of liability findings based on two kinds of showings plaintiffs can attempt to make. Of course, sometimes the evidence only would support one of the two. Only a mix of motives is plausible if defendant clearly has some non-discriminatory motivation; only pretext is plausible "where, on the particular evidence, no reasonable trier could find that two motives could have simultaneously coexisted." *Fields*, 115 F.3d at 122.

Accordingly, the court's inquiry on summary judgment is whether plaintiff presents competent evidence that could convince a reasonable fact finder that discrimination on the basis of protected status played a motivating factor in a material adverse action. This inquiry includes all four traditional prima facie case elements because if any are absent (e.g., no material adverse action), then no reasonable fact finder could find liability for discrimination.

## B. Potential Barriers to Dr. Curley's Case

Before evaluating Dr. Curley's showing, the court must address the University's contention that there are two threshold barriers to Dr. Curley's case: first, that Dr. Curley's lack of economic damages precludes an ADEA claim; second, that the change in teaching assignment was not a material adverse action sufficient to support an ADEA claim. Neither consideration is an absolute bar to a plaintiff's verdict, so neither is a ground for summary judgment.

### 1. Lack of Economic Damages

■ The University is correct that the ADEA does not permit damages for emotional pain and suffering. *See* 29 U.S.C. § 626(b); *Johnson v. Al Tech Specialties Steel Corp.*, 731 F.2d 143 (2d Cir.1984). However, a lack of economic damages would not require dismissal of plaintiff's entire ADEA claim. Reinstatement may well be the appropriate remedy for a plaintiff who, like Dr. Curley, claims a material adverse job change that does not include a pay cut. The statute explicitly envisions that, in an appropriate case, a court might grant only equitable relief:

> In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal *or* equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion.... Any person aggrieved may bring a civil action in any court of competent jurisdiction for such legal *or* equitable relief as will effectuate the purposes of this chapter. 29 U.S.C. § 626(b), (c)(1) (emphasis added).

In support of its argument that the ADEA addresses only discrimination featuring economic damages, the University provides an off-point citation from *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2nd Cir. 1997) (affirming summary judgment on ADEA retaliation claim where plaintiff failed to show sufficiently adverse action), and an out-of-context quote from *Monica v. N.Y. City Off–Track Betting Corp.*, 1995 WL 117879, *1 (S.D.N.Y.1995) ("Since Plaintiff has not presented any evidence of lost wages her ADEA claim is dismissed based on her failure to show actual damages."), *aff'd*, 100

F.3d 941 (2d Cir.1996) (mem.). In the quoted *Monica* passage, the court did dispose of the plaintiff's ADEA claim for damages, but then proceeded to consider plaintiff's ADEA claims of de facto demotion and harassment under the *McDonnell Douglas* framework, ultimately finding insufficient adverse action. *Id.* at *3–*6. Because it continued the ADEA inquiry after dismissing the damages claim, *Monica* does not support the proposition that a lack of economic damages bars an ADEA claim for other relief.

The University's contention that age discrimination is not actionable unless it produces economic loss is wholly unsupported by the two cases the University cites or any other cases. If Dr. Curley prevails at trial, he may win whatever package of relief the court deems appropriate. It is not fatal to his cause that his relief might include only equitable remedies.

### 2. Material Adverse Action

■ The existence of a material adverse employment action is a close call. The decision to assign Dr. Curley only undergraduate courses did not change his compensation, benefits, nor tenure status. Dr. Curley argues, with support from Dr. Gopaul–McNicol, that his switch from being a graduate instructor to an undergraduate instructor was tantamount to a demotion or punishment. *See* Tr. 14; Pl.Ex. G, Gopaul–McNicol Aff. Dr. Curley's evidence is sufficient to prove to a reasonable fact finder that at the University, graduate teaching is more prestigious and leads to more professional growth opportunity. His removal from graduate teaching then would be a material adverse change in the terms and conditions of his employment.

The definitions of "material" and "adverse" in this context are broad enough to include non-economic but significantly disadvantageous job changes like the University's stripping of Dr. Curley's graduate course load. Courts have found job changes materially adverse when they significantly reduce job prestige or higher-level duties without immediate financial impact. *See, e.g., Preda v. Nissho Iwai Am. Corp.*, 128 F.3d 789, 791 (2d Cir.1997) (material change when employer excluded plaintiff from meetings, reduced job duties, and assigned clerical tasks to

plaintiff); *de la Cruz v. N.Y. City Human Resources Admin.*, 82 F.3d 16, 21 (2d Cir. 1996) (plaintiff "arguably" experienced materially adverse change when employer transferred him from elite to less prestigious position); *Castro v. N.Y. City Bd. of Educ. Personnel Dir.*, No. 96 Civ. 6314, 1998 WL 108004, *6 (S.D.N.Y.1998) ("A material adverse change is one that has an attendant negative result, a deprivation of a position or an opportunity ... and is typically indicated by dismissal, demotion, diminution of wages, or diminished opportunities for professional growth." (*quoting Campbell v. Grayline Air Shuttle, Inc.*, 930 F.Supp. 794, 802 (E.D.N.Y. 1996))).

The University argues that Dr. Curley's failure to continue to fight the action weighs against finding it materially adverse. With the exception of a belated request in 1998, Dr. Curley has not requested to teach graduate courses after the fall of 1996 and has not taught a graduate course since the spring of 1996. Dr. Curley did oppose the decision actively before it was final, however, by attending the P & B Committee meeting and submitting a memorandum and a packet of course materials. *See* Def.Exs. 16, 17.

Given the forcefulness of the University's decision, *see* Def.Ex. 18, Fagen Letter ("we have concluded that the educational, ethical, and legal implications are so overpowering, we have no choice"), the fact finder could agree with Dr. Curley's conclusion that the University's rejection of his pleas meant that Dr. Curley would no longer teach graduate courses. The law does not require plaintiffs opposing adverse action, especially while trying to remain on the job, to continue tilting at windmills forever. Dr. Curley's response to the action was not so passive as to bar him from challenging it now.

### C. Dr. Curley's Evidence of Pretext and Age Discrimination

■ Dr. Curley has presented sufficient evidence of his qualifications to leave a disputed question of fact as to the University's assertion that it removed him from graduate teaching solely because of his shortcomings. *See, e.g.,* Pl.Ex. G, Gopaul–McNicol Aff.; Pl.

Ex. H, Students' Affs. Together with his evidence of age-based animus against him, he could prove that the University's position is a pretext for at least partially discriminatory motives.

### 1. Evidence of Pretext in the University's Rationales

The University has offered evidence that could convince a reasonable fact finder that it acted solely on Dr. Curley's shortcomings as a teacher, scholar, graduate student supervisor, and grant-seeker. The complaints came from many sources, including non-parties, *see, e.g.,* Def's Notice Mot. Summ. J., Students' Affs, and outside experts, *see, e.g.,* Def.Ex. 12, at C1126. The University's efforts to build a doctoral program makes these shortcomings particularly important.

Dr. Curley's defense of his performance, however, is sufficient as an initial showing and sufficient to call the University's defense into question. While Dr. Curley might not defeat the mass of criticism entirely, such as the views of independent evaluators whose opinions mattered to the University in its quest for a doctoral program, that is not necessary for two reasons. First, quality of performance is a relative question: was Dr. Curley less qualified than those the University sought for his position? Even if Dr. Curley is no an academic superstar, it is not clear that superstardom is the University's true standard. The University can assert whatever standards it likes, but Dr. Curley can rebut the University's claim that it truly applied those standards in its faculty decisions and found Dr. Curley to fall short. Aside from challenging the criticisms of him, Dr. Curley notes that he has qualifications that the Department did not demand of other faculty, such as his license to practice.

Second, quality of performance is a question of degree: was Dr. Curley so bad that his shortcomings truly were the University's sole motivation? Even if Dr. Curley is less qualified than the University would like its professors to be, it remains unclear exactly how substandard the University truly found him. He cannot be totally incompetent as an educator if, as the University concedes, "he has been successfully teaching undergradu-

ates and everybody is happy." Tr. 48. Dr. Curley could prove that his performance was only minimally substandard or that it was good and inaccurately assessed by the outside evaluators and others. Such a showing could prove pretextual the University's assertion that it stripped Dr. Curley's graduate teaching assignments solely because of performance concerns.

Apart from the question of job performance, Dr. Curley presents evidence that Dr. DiGiuseppe and others supported false misconduct charges against him. *See* Pl.Ex. G, Gopaul–McNicol Aff. ¶ 16. If Dr. Curley proves that those supporting these charges did not have a good-faith basis for doing so, that could help show that the University sought pretextual rationales for acting against him.

### 2. Evidence of Age Discrimination in the Decision–Making Process

Over age 60 at all relevant times, Dr. Curley is unquestionably a member of the ADEA-protected over–40 age class. Dr. Curley's evidence of age-based animus directed against him could prove that the University's asserted rationales are not just questionable in general but pretexts for age discrimination in particular. *See, e.g.,* Pl.Ex. I, Curley Dep.; Pl.Ex. G, Gopaul–McNicol Aff. At the least, Dr. Curley could prove that even if his shortcomings motivated the University, age was a motivating factor as well. That showing would render Dr. Curley a prevailing party. While the University then could prove that its legitimate performance concerns would have led to the same outcome, such a showing does not "avoid all liability," but only "limits the relief to which the plaintiff is entitled." *Fields,* 115 F.3d at 123–24.

#### a. Ambiguity in Dr. Curley's Evidence of Age Bias

Dr. DiGiuseppe's statements are evidence that he had age-based bias against Dr. Curley. The University argues that several of Dr. DiGiuseppe's comments, including those referring to Dr. Curley as "dead wood" and "over the hill," were simply reports of students' views. *See* Def.Mem.Supp.Summ.J. 39–40. This defense finds support in Dr.

Curley's deposition. *See* Curley Dep. 341, 353, 790. In light of the other evidence of age bias, however, a reasonable fact finder could agree with Dr. Curley that Dr. DiGiuseppe was conveying his adherence to the views he attributed to students.

As to other statements, the University plausibly may label them "ambiguous," Def. Mem.Supp.Summ.J. 41, but may not preclude Dr. Curley's interpretation. *See, e.g.,* Curley Dep. 351 (recounting Dr. Giuseppe questioning Dr. Curley about his age and then asking, "Boy, what are you doing here, why are you still here?"). The ambiguity is sufficient to preclude summary judgment for Dr. Curley, but insufficient to merit summary judgment for defendant. Interpretation of plausibly discriminatory ambiguous negative comments is a question for trial.

### b. Tracing Evidence of Age Bias to the Decision–Making Process

As Director of the Program and a voting member of the P & B Committee, Dr. DiGiuseppe may have been enough of a decision-maker, and played enough of a role in the decision-making process, that his alleged age-based motivations infect the University's decision to alter Dr. Curley's teaching assignment. The University emphasizes that any such motivations are stray remarks unrelated to the decision-making process because Dr. DiGiuseppe and Dr. Fagen are peers of Dr. Curley and the dean makes the "final decision." Tr. 63.

■ Yet even if Dr. DiGiuseppe and Dr. Fagen are Dr. Curley's peers, they are peers with power to affect the terms and conditions of Dr. Curley's employment in material adverse ways, such as by altering his course load. The presence of other decision-makers, from other P & B Committee members to the dean, is a defense for the University, but not a dispositive one, because diffusion of authority does not insulate decisions from ADEA liability. A plaintiff need not prove every one of the decision-makers biased in order to argue that the discriminatory motives of some of the decision-makers rendered the decision discriminatory.

### c. Intra–Group Age Discrimination by Those Over Age 40

The University certainly can attempt to disprove age discrimination by noting that almost the entire cast of characters was over age 40, from the decision-makers to the other faculty teaching graduate courses. Yet the ADEA concept of age discrimination includes favoring a younger worker also over age 40. *See O'Connor v. Consol. Coin Caterers,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (allowing a 56 year-old worker to claim age discrimination when replaced by a 40 year-old). Even where the age difference is too small to support an inference of discrimination, the plaintiff can try to prove discrimination by other means, such as direct evidence. *See, e.g., McDaniel v. Mead Corp.,* 622 F.Supp. 351 (W.D.Va.1985), *aff'd,* 818 F.2d 861 (4th Cir.1987) (so holding where plaintiff was 54 and his replacement was only four months younger). Here, with Dr. Curley 10 to 17 years older than Dr. DiGiuseppe, the rest of the P & B Committee, and his replacements, the age difference is nontrivial. Age discrimination may be less likely from 45–to–52 year olds than from thirtysomethings, but it is possible, as *O'Connor* recognized.

More broadly, the Supreme Court recently emphasized the plausibility of various forms of intra-group discrimination in *Oncale v. Sundowner Offshore Svcs., Inc.,* —— U.S. ——, ——, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998). In allowing a claim for male-on-male sexual harassment, the Court noted that "in the related context of racial discrimination in the workplace we have rejected any conclusive presumption that an employer will not discriminate against members of his own race. 'Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of that group.' " *Id.* (quoting *Castaneda v. Partida,* 430 U.S. 482, 499, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977)).

Intra-group discrimination is especially plausible when group membership is not a simple binary variable, but a more continuous variable, whether because of degrees of membership, sub-groupings, of multi-group

intersectionality. *See, e.g., St. Francis College v. Al–Khazraji,* 481 U.S. 604, 610 n. 4, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1976) (allowing Arabic Caucasian's claim of racial discrimination by European Caucasians because "[c]lear cut categories do not exist.... Differences between individuals of the same race are often greater than the differences between average individuals of other races."); *Franceschi, et al. v. Hyatt Corp.,* 782 F.Supp. 712 (D.P.R.1992) (allowing § 1981 claim when Puerto Rican hotel employees denied service to non-English-speaking Puerto Ricans). A useful analogy to age variation among over–40 workers is skin tone variation among black workers, which clearly may be a basis for discrimination. *See, e.g., Walker v. Sec'y of Treasury,* 713 F.Supp. 403 (N.D.Ga. 1989) (finding discrimination against lighter-skinned black worker by darker-skinned black supervisor).

Overall, a broad body of precedent recognizes that intra-group discrimination exists, especially against those with often-disfavored status within the group, such as the darkest-skinned among people of color or the oldest among middle-aged workers. In this light, a reasonable fact finder could conclude that the circumstances of Dr. Curley's assignment warrant an inference of age discrimination by the younger over–40 workers who made the decision.

## III. CONCLUSION

For the reasons discussed above, defendant St. John's University's Fed.R.Civ.Proc. 56 motion for summary judgment against plaintiff James F. Curley is denied.