**Reynell A.H. LYNCH, Plaintiff,**

v.

**PATHMARK SUPERMARKETS, Defendant.**

**No. 96 Civ. 6783(SAS).**

United States District Court, S.D. New York.

Sept. 23, 1997.

---

Sara C. Kay, Steven Narow, BLS Legal Services Corp. Brooklyn, NY, for Plaintiff.

Neal I. Korval, Neil A. Capobianco, Vedder, Price, Kaufman, Kammholz & Day, New York, NY, for Defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiff filed a Complaint on August 9, 1996, asserting a claim for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Plaintiff claims that the defendant, his former employer, discriminated against him on the basis of his religion. Defendant now moves for summary judgment pursuant to Fed.R.Civ.P. 56(b). For the reasons stated below, defendant's motion is granted.

### I. Legal Standard for Summary Judgment

A motion for summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The moving party has the burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997).

In determining whether summary judgment should be granted, the court resolves all ambiguities and draws all reasonable inferences against the moving party. *See id.* Courts must be particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is at issue. *See Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994). Even in these cases, however, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgement." *Schwapp,* 118 F.3d at 110. Instead, the plaintiff "must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14 (2d Cir.1995).

### II. Factual Background

The following facts are undisputed. Lynch was hired by the defendant in July, 1976 as a butcher. Throughout the period of his employment, Lynch was a member of Local 174 of the United Food and Commercial Workers International Union ("Union"). Defendant's Rule 56.1 Statement ("Def's 56.1") at ¶ 1. From December, 1988, and possibly earlier, disputes between the defendant and its employees were governed by a collective bargaining agreement that referred "all complaints, disputes or grievances" to binding arbitration. *Id.* at ¶ 45. This agreement provided, *inter alia,* that the defendant had the right to terminate any employee for "just cause." [1] It did not, however, give employees the individual right to contest termination decisions. Though employees were to

---

1. The agreement also provides that "the parties... will not discriminate against any employee ... because of age, race, sex, color, creed or national origin."

be bound by the results of any arbitration, only the Union had the ability to enforce the terms of the agreement.[2]

From early on, Lynch's career at Pathmark was marked by repeated conflicts with supervisors and co-workers. In 1979, six separate complaints were recorded in Lynch's disciplinary file concerning his use of profanity, poor attitude, excessive lateness and absenteeism. After 1979, the rate of complaints slowed, but did not cease. In November, 1982, he was suspended for leaving work early. In May, 1983, he was suspended for absenteeism. He was suspended for a third time in February, 1984, this time for having engaged in a fight with a co-worker. Later that year, a supervisor, Armando Massari, wrote an inter-office memorandum describing Lynch as chronically late and disruptive. Massari "strongly" recommended plaintiff's termination. *Id.* at ¶¶ 2–10, 12.

In March 1986, Lynch was issued warnings for absenteeism and poor work. In January 1987, he received warnings for disruptive and insubordinate behavior. Similar warnings were issued in February, 1987 and October, 1989. *Id.* at ¶¶ 13, 15, 18, 20, 22.

Lynch became a "born again" Christian in January, 1990. Affidavit of Reynell A.H. Lynch ("Lynch Aff.") at ¶ 4. His disciplinary problems persisted: In February, 1990, he was suspended for stealing food, and in April, 1990, he was suspended for absenteeism. Pathmark's first attempt to actually terminate him was made later that year. Lynch failed to show up for work on August 26, 1990, a Sunday, and was terminated by John Padian, Pathmark's head of personnel. The Union challenged this decision on the grounds that the collective bargaining agreement prohibited Pathmark from requiring employees with a demonstrable religious commitment to work on Sundays. The arbitrator agreed with the Union and ordered that Lynch be reinstated. However, citing his dismal employment record, the arbitrator also allowed the three and a half month period since his termination to stand as a disciplinary suspension without pay and issued the plaintiff a "final warning." Def's 56.1 at ¶¶ 24–26, 29–30.

Lynch's relationship with Pathmark apparently improved for a year or so after the arbitration hearing. In June, 1993, however, Padian received a written complaint alleging that Lynch was again engaged in persistent absenteeism and was unable to work with fellow employees. *Id.* at ¶ 31.

In April, 1994, Lynch was transferred to a Pathmark store in Bay Plaza, the Bronx. Lynch Aff. at ¶ 11. George D'Angelo, the store manager at Bay Plaza, received complaints from several of Lynch's co-workers about his lack of productivity: Hector Caballos and Tony Midea told D'Angelo that Lynch did "half the work" of other employees. Meat Manager Carolyn Griffin and First Person John Dorso made similar allegations. Angie Iglesias complained that Lynch annoyed her, and requested that he not speak to her. D'Angelo himself observed Lynch's performance on several occasions, and found it "sub-par." Deposition of George D'Angelo at 144–50.

Lynch, in turn, complained that Griffin and Dorso had engaged in a campaign of harassment against him. According to Lynch, Griffin often referred to him as a "dumb born again Christian," mocked him for spending too much time at church, and held him to a higher standard of behavior than she did other employees. According to Lynch, Dorso swore at him and ridiculed him by loudly singing secular songs when he sang Christian songs. Lynch Aff. at ¶¶ 15–19, 22, 28. Lynch's allegations in this regard are supported by Lynch's co-workers Robin Jones and Gerry Smith, who state that Griffin and Dorso "called him names" and "degraded his religion." Jones and Smith also contend that Lynch was a good employee, and as productive as anyone else in the department. Affidavit of Gerry Smith at ¶¶ 4–13; Affidavit of Robin Jones ("Jones Aff.") at ¶¶ 4–10. Lynch does not allege that D'Angelo participated materially in Griffin and Dorso's campaign of harassment; he does, how-

---

**2.** The agreement reads, in pertinent part: "The Agreement shall confer no individual rights on an employee and may be enforced only by the Union and the Employer. Any agreement between the Union and the Employer shall be binding upon the employees involved."

ever, allege that D'Angelo occasionally made insensitive remarks to him such as "God may have your soul, but your ass belongs to me" and "you have the Bible in your hand, but you still look up the women's skirts." Lynch Aff. at ¶ 24.

Meanwhile, Lynch continued to rack up disciplinary warnings, receiving four during the five month period that he worked at Bay Plaza. The last of these was issued with regard to events that took place on September 17, 1994. Def's 56.1 at ¶¶ 37–41. According to D'Angelo, Lynch had refused to leave the work area when so requested by his supervisor, and persisted in this refusal until security was called. Def's 56.1 at ¶ 41. According to Lynch, Dorso falsely accused him of working too slowly and he remained in the work area only in an attempt to find D'Angelo and prevent a misunderstanding. Lynch Aff. at ¶ 25. In any event, D'Angelo wrote a letter to Padian two days later recommending that Lynch be fired. This recommendation was based on Lynch's long disciplinary history, inability to work with others and his generally disruptive attitude. On September 22, Padian fired Lynch, citing the same considerations. Def's 56.1 at ¶¶ 42–43.

The Union grieved Lynch's termination. On January 19, 1995, an arbitration hearing was held pursuant to the terms of the collective bargaining agreement before George Sabatella. The Union argued that termination was an unduly harsh penalty for what Lynch had done and that he had been the victim of a campaign of harassment on the part of his supervisors. Def's 56.1, Ex. 39 (Opinion of Arbitrator Sabatella, dated 2/28/95). According to Jones, however, the subject of Lynch's religion was barely mentioned in the hearing. Jones Aff. at ¶ 11.

The arbitrator found "without hesitation" that just cause for Lynch's dismissal existed, citing Lynch's prior disciplinary history, the final warning he had received and Pathmark's patience in dealing with him. The arbitrator further found Lynch's allegations of harassment to be "unsubstantiated, incredible and in no way going [sic] to explain a work record such as [his]." Defendant's Exhibit 39; plaintiff's exhibit H.

In April or May of 1995, Lynch filed a dual charge of wrongful discharge with the Equal Employment Opportunity Commission and the New York State Division of Human Rights, claiming that Pathmark had discriminated against him on the basis of his religious beliefs. The Division of Human Rights conducted an investigation into the case, and concluded that no probable cause existed to support Lynch's allegations. Lynch received a right to sue letter from the EEOC on May 8, 1996. Lynch Aff. at ¶ 32; Def's 56.1 at ¶¶ 47–48. This suit followed.

## III. Discussion

### A. Collateral Estoppel

■ A threshold issue is whether Lynch is collaterally estopped from raising his claim of religious discrimination in light of arbitrator Sabatella's findings. Pathmark argues that because Mr. Sabatella found that it had just cause to discharge Lynch and that Lynch's proffered allegations of harassment were not credible, those issues are foreclosed in the current proceedings. Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 15–18.

In *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Supreme Court considered an almost identical situation. The plaintiff in *Gardner–Denver* was an African–American drill operator discharged by the defendant employer, ostensibly for poor performance. The defendant had a collective bargaining agreement with the plaintiff's union pursuant to which the defendant was granted the right to fire employees for "just cause." The union grieved the plaintiff's discharge, raising the claim that he had been discriminated against on the basis of his race; the arbitrator, however, ruled that "just cause" for the firing had existed. The plaintiff then sued in federal court under Title VII. The district court granted summary judgment for the defendant on the theory that the suit was precluded by the arbitration, and the Tenth Circuit Court of Appeals affirmed. *See id.* at 38–43, 94 S.Ct. at 1015–17.

The Supreme Court reversed, holding that the arbitral ruling could have neither res

judicata nor collateral estoppel effect on a subsequent Title VII action. The Court gave several grounds for this decision. First, it emphasized the difference between contractual rights, such as those granted by a collective bargaining agreement, and the statutory rights granted by Title VII, and noted that the jurisdiction exercised by labor arbitrators is confined to the former. *See id.* at 49–54, 94 S.Ct. at 1020–23. Second, it questioned the efficacy of procedural safeguards available to grievants in arbitration, and concluded that Congress intended Title VII plaintiffs to enjoy the greater protection offered by federal courts. *See id.* at 56–57, 94 S.Ct. at 1023–24. Finally, the Court concluded that given the unions' control of individual employees' representation in the grievance process, arbitration in the collective bargaining context is an unreliable means of adjudicating individual rights:

> In arbitration ... the interests of the individual employee may be subordinated to the collective interests of all employees in the bargaining unit. Moreover, harmony of interest between the union and the individual employee cannot always be presumed, especially where a claim of ... discrimination is made.... In this respect, it is noteworthy that Congress thought it necessary to afford the protections of Title VII against unions as well as employers.

*Id.* at 58 n. 19, 94 S.Ct. at 1024 n. 19. Thus, the Court concluded that though arbitral findings should be admissible as evidence in related Title VII actions, they should be given no preclusive effect.[3]

Pathmark attempts to distinguish *Gardner–Denver* by arguing that, unlike Mr. Sabatella, the arbitrator there made no explicit findings as to the plaintiff's discrimination claim, and implies that this is why his findings were not given preclusive effect. This argument is without merit. First, Mr. Sabatella's "findings" on the subject of religious

discrimination were conclusory at best; in fact, there is evidence that the subject of religion was barely mentioned during the hearing. Second, the *Gardner–Denver* Court never discussed the fact that the arbitrator failed to address the question of discrimination.

Pathmark also argues that *Gardner–Denver* has been implicitly overturned by the Supreme Court's subsequent decision in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). Pathmark correctly notes in this regard that Gilmer has effectively reversed the *Gardner–Denver* presumption that arbitration is an unreliable means of resolving claims based on individual statutory rights. *See Gilmer,* 500 U.S. at 30–32, 111 S.Ct. at 1654–55 (noting the Court's "current strong endorsement" of arbitral resolution of statutory claims) (citation omitted). However, *Gilmer* is otherwise distinguishable from both *Gardner–Denver* and the case at bar.

The plaintiff in *Gilmer* was a financial services manager who, having signed an agreement to submit any dispute he had with his employer to binding arbitration, brought an age discrimination claim in federal court upon being terminated at age 62. *See id.* at 23, 111 S.Ct. at 1650. The Supreme Court held that the employer could compel arbitration, concluding that nothing in the structure or text of the ADEA indicated that Congress intended to make claims under it non-arbitrable. *See id.* at 28–29, 111 S.Ct. at 1653–54. As the Court noted, *Gardner–Denver* was not directly applicable because the plaintiff had agreed to submit his statutory claims to arbitration. Unlike in *Gardner–Denver,* therefore, the arbitrator had jurisdiction to rule on the plaintiff's ADEA claims, and there was no risk that a union would sacrifice his interests for the benefit of other workers. *See id.* at 35, 111 S.Ct. at 1657.

---

3. *See id.* at 60, 94 S.Ct. at 1025. As to the weight that courts should grant arbitral findings, the Court held:

> We adopt no standards ... since this must be determined in the court's discretion with regard to the facts and circumstances of each case. Relevant factors include the existence of provisions in the collective-bargaining agreement that

conform substantially with Title VII, the degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators. Where an arbitral determination gives full consideration to an employee's Title VII rights, a court may properly accord it great weight. *Id.* at 60 n. 21, 94 S.Ct. at 1025 n. 21 (citations omitted).

The case at bar, of course, is distinguishable from *Gardner–Denver* in that the defendant seeks to preclude Lynch's claim on the basis of collateral estoppel rather than res judicata. The distinction is purely conceptual—the claim would be effectively barred under either theory—but it could solve the jurisdictional problem: Though the collective bargaining agreement did not give Sabatella the power to decide Lynch's Title VII claim, it did give him the power to make findings on the factual issue of whether Pathmark discriminated against Lynch on the basis of his "creed."

Even if this is correct, however, the third rationale for the *Gardner–Denver* decision—the risk that a union will not adequately represent the interests of some individual members at arbitration—remains applicable. *See Pryner v. Tractor Supply Co.,* 109 F.3d 354, 363 (7th Cir.1997) (because of the risk that employee and union interests will conflict, a "union cannot consent [to arbitration] for the employee by signing a collective bargaining agreement that consigns the enforcement of statutory rights to the union-controlled grievance and arbitration machinery created by the agreement."); *Humphrey v. Council of Jewish Federations,* 901 F.Supp. 703, 710 (S.D.N.Y.1995); *Kirkendall v. United Parcel Service, Inc.,* 964 F.Supp. 106, 108 (W.D.N.Y.1997); *LaChance v. Northeast Publishing, Inc.,* 965 F.Supp. 177, 183 (D.Mass.1997); *see also Tran v. Tran,* 54 F.3d 115 (2d Cir.1995) (*Gilmer* distinguished, but did not overrule, *Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), a case barring preclusive effect to arbitration mandated by a collective bargaining agreement in a subsequent Fair Labor Standards Act case). *But see Austin v. Owens–Brockway Glass Container, Inc.,* 78 F.3d 875 (4th Cir. 1996) (employee barred from pursuing Title VII and Americans with Disabilities Act claims in federal court when provision of collective bargaining agreement required all employee/employer disputes to be submitted to binding arbitration).

In fact, this case is a persuasive illustration of why *Gardner–Denver* enjoys continuing vitality: Lynch had a long history of mutual antagonism with a great number of fellow employees, many of whom were members of the Union as well. Union management, then, had little to lose politically, and perhaps something to gain, if his termination were upheld. Under these circumstances, one might entertain reasonable suspicions that his representation in the arbitration hearing might have been less than vigorous. In fact, Lynch alleges that his Union attorney was reluctant both to raise his claim of religious discrimination and to call witnesses in his defense. Whether or not this charge is true, the possibility that it is counsels against giving the arbitral findings preclusive effect.

Therefore, the plaintiff is not estopped from raising his claim of religious discrimination in this action. I will give the findings of Mr. Sabatella the weight they merit; I note in this regard, however, that the issue of religious bias as a motivation for Lynch's termination was clearly not the focus of his decision.

### B.   Pretext Theory

■   To recover under Title VII on a "pretext" theory, a plaintiff must first establish, by a preponderance of the evidence, a prima facie case that illegal discrimination has occurred. *See Scaria v. Rubin,* 117 F.3d 652, 653 (2d Cir.1997); *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). A prima facie case is established in a wrongful dismissal case when the plaintiff shows that 1) he belongs to a protected class, 2) he was performing his duties satisfactorily, 3) he was discharged, and 4) his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994). The level of proof plaintiff must present in order to demonstrate a prima facie case is "minimal." *Fisher v. Vassar College,* 114 F.3d 1332, 1337 (2d Cir.1997). In fact, a plaintiff can successfully state a prima facie case without adducing enough evidence to support a rational jury verdict in his favor. *See id.* Once this burden is met, the defendant must then "produc[e] evidence that the plaintiff was [discharged] . . . for a

legitimate, nondiscriminatory reason." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). If the defendant establishes such a reason, the presumption of discrimination established by the prima facie case disappears, and the plaintiff "must ... point to sufficient evidence to reasonably support a finding that he was harmed by the employer's illegal discrimination." *Fisher*, 114 F.3d at 1337.

### 1. Prima Facie case

Here, defendant does not dispute that the plaintiff has established elements 1 and 3 of his prima facie case; thus, the only dispute is as to whether the plaintiff was performing his duties satisfactorily and, if so, whether the discharge occurred in circumstances giving rise to an inference of discrimination based on religious bias.

It is theoretically possible that a finder of fact could conclude that Lynch was performing his job satisfactorily at the time of his discharge. I need not reach the issue of whether this possibility is sufficient to meet the "satisfactory performance" element of the plaintiff's prima facie case, however, as I find that the plaintiff has failed to proffer any evidence that could support a rational inference that he was discharged because of religious bias.

■ The undisputed evidence shows that the decision to terminate Lynch was made by John Padian, based on a recommendation by George D'Angelo. D'Angelo Aff. at 237. Lynch asserts that Carolyn Griffin and John Dorso exercised influence in the decision making process as well, and even claims that "without their input, Mr. D'Angelo has [sic] no independent basis" for making the decision. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 27. This assertion, however, is not supported by any evidence and is contradicted by undisputed testimony that D'Angelo personally observed Lynch's performance on several occasions and found it wanting. D'Angelo Aff. at 162. Lynch vigorously contends that Griffin and Dorso harassed him on the basis of his religion; however, he cannot proffer any evidence that this harassment

played any part in his dismissal. *See McLee v. Chrysler Corp.*, 109 F.3d 130, 137 (2d Cir. Mar.25, 1997) (allegation that plaintiff's supervisor had made a racially derogatory remark and had "spit on the chairs of minority employees" was insufficient to satisfy fourth element of prima facie wrongful termination case when the supervisor did not participate in the termination decision).

■ As to Padian, Lynch does not allege that he had any discriminatory animus. This leaves D'Angelo, alleged author of the statements: "God may have your soul, but your ass belongs to me" and "you have the Bible in your hand, but you still look up the women's skirts." Lynch Aff. at ¶ 24. Even with all rational inferences drawn in the plaintiff's favor, neither comment can be interpreted as evidencing bias against born again Christians.

The first statement is likely an exhortation to work harder or possibly an assertion of D'Angelo's authority during working hours. Neither interpretation, however, supports the plaintiff's theory that D'Angelo was biased against born again Christians. The second is similar: It could have been intended as a crude joke or as a serious accusation of hypocrisy. In either event, the comment offers no evidence that D'Angelo harbored anti-born again Christian bias. Statements do not demonstrate discriminatory animus merely because they reflect poorly on the plaintiff. *See Fisher v. Vassar College*, 70 F.3d 1420, 1441 (2d Cir.1995), *aff'd en banc*, 114 F.3d 1332 (2d Cir.1997) (notes of committee that denied married woman tenure said she was "out of touch" after taking nine years off; even if interpreted to mean that the committee felt her skills had become obsolete, this sentiment betrays no discriminatory bias); *Hill v. St. Louis Univ.*, 123 F.3d 1114, 1119 (8th Cir.1997) (statement by supervisor made after plaintiff resigned that he wanted to bring "fresh blood" into the position was not probative of age discrimination). As this is the only evidence that is proffered to support Lynch's claim that his

dismissal was motivated by bias, his prima facie case fails.

### 2. Defendant's proffer of a non-discriminatory motivation

■ Even if Lynch could somehow satisfy the requirements of a prima facie case, his pretext claim would be insufficient to withstand a motion for summary judgment. If such a case had been established, the burden of production would shift to the defendant to articulate a "legitimate, non-discriminatory reason" for Lynch's dismissal. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. Pathmark would clearly satisfy this requirement: D'Angelo testified that Lynch was fired because of his "sub-par" performance and extraordinary disciplinary history.

### 3. Plaintiff's burden of showing sufficient evidence to support a jury verdict

■ Once a non-discriminatory reason is proffered, "the *McDonnell–Douglas* framework—with its burdens and presumptions— is no longer relevant." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). The issue then becomes simply whether the plaintiff can "point to sufficient evidence to reasonably support a finding that he was harmed by the employer's illegal discrimination." *Fisher*, 114 F.3d at 1337. As to this issue, the mere fact that a prima facie case has been established carries no weight in and of itself. *See id.* at 1337.

Lynch cannot meet this burden. As noted above, he asserts that he was harassed by Carolyn Griffin and John Dorso because of his religious beliefs, but has produced no evidence linking this harassment to his termination. Therefore, there is insufficient evidence to reasonably support a finding of a Title VII violation by Pathmark.

### B. Mixed Motive Theory

■ To recover under Title VII on a "mixed motive" theory, a plaintiff must "focus his proof directly at the question of discrimination and prove that an illegitimate factor had a motivating or substantial role in the employment decision." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir.1992) (internal quotations omitted). "The types of indirect evidence that suffice in a pretext case to make out a prima facie case—

or even to carry the ultimate burden of persuasion—do not suffice, even if credited, to [meet this standard]." *Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir. 1997) (internal quotations omitted). Instead, "direct" evidence must be shown; evidence that is considered "direct" for this purpose includes, inter alia, policy documents and evidence of behavior by decision makers that reflects the alleged discriminatory attitude. *See id.* "In short, to warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." *Id.* Once the plaintiff has sufficient direct evidence of discriminatory animus, the employer must prove that it would have made the same decision even had there been no such animus. *See de la Cruz v. New York City Human Resources Admin. Dept. of Soc. Servs.*, 82 F.3d 16, 23 (2d Cir. 1996).

■ Lynch has failed to produce evidence that could support a rational inference that his termination was motivated by religious bias. By definition, then, he has failed to produce the "smoking gun" necessary to defeat summary judgment on a mixed-motive theory. *Raskin*, 125 F.3d at 60. Moreover, it is clear that Lynch has offered virtually no evidence to support his allegation that bias played a substantial or motivating role in his dismissal. As noted above, though he has testified that he was subjected to harassment by some of his supervisors, he has not offered any evidence to support his assertion that these supervisors were influential in the decision to terminate him. As for the people who did have such influence, Lynch either makes no allegations at all or offers evidence that utterly fails to demonstrate bias. Thus, his claim cannot survive a motion for summary judgment on a mixed motive theory.

### IV. Conclusion

Plaintiff has failed to demonstrate that his termination occurred in circumstances allowing a reasonable inference of discriminatory intent. He has similarly failed to adduce direct evidence that bias played a motivating or substantial role his termination. Because there are therefore no genuine issues of material fact in dispute, the defendant's sum-

mary judgment motion is granted and the complaint is dismissed.