Rabbi David SHAIN and Bella Parnes Plaintiffs,

v.

**CENTER FOR JEWISH HISTORY, INC. Defendant.**

**No. 04 Civ. 1762(NRB).**

United States District Court, S.D. New York.

Sept. 19, 2005.

Lindsay Nicely Feinberg, Gelman & Feinberg, New York, New York, for Plaintiffs.

M. Zeb Landsman, Becker, Glynn, Melamed & Muffly LLP, New York, New York, for Defendant.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Plaintiffs Bella Parnes and Rabbi David Shain bring this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by 42 U.S.C. § 1981 ("Title VII"), the New York State Human Rights Law, Executive Law § 296, *et seq.*, and the New York City Human Rights Law, Administrative Code of the City of New York, Section 8–101, *et seq.* for alleged religious discrimination in their workplace. Plaintiffs worked for the Center For Jewish History, Inc. (the "Center"), an institution comprising five Jewish charitable organizations. Plaintiffs allege that Center employees, the vast majority of whom are either Jews who are less observant than plaintiffs or are non-Jews, subjected them to discrimination because of bias against plaintiffs' level of religious observance, and that they were

terminated by the Center for discriminatory reasons and were subjected to a religiously hostile work environment.

Plaintiff Parnes also complains of sex and age discrimination, and brings this action pursuant to the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621, *et seq.* (the "ADEA") and pursuant to the gender discrimination provisions of Title VII, as well as under the aforementioned provisions of New York State and New York City Human Rights Law.

Defendant now moves for summary judgment against all of plaintiffs' claims. For the reasons set forth herein, defendant's motion is granted in part and denied in part.

## BACKGROUND [1]

### A. Plaintiff Shain

Rabbi David Shain is an Orthodox Hasidic Jew of the Chabad Sect. He therefore observes Jewish religious laws strictly, including wearing a *yarmulkeh* on his head, wearing *tzitzis* (religious fringes) showing on the outside of his clothing, and refraining from cutting his beard.

The Date Palm Café ("Café") is the Center's cafeteria. Village Crown, a catering company, ran the Café for some time until March of 2002. From January through March of 2002, Shain worked in the Café as a *Mashgiach*, a person who supervises food preparation to make sure it abides by *kashruth*, the Jewish dietary laws. When Village Crown left the Café, Shain proposed to Michael Winter, Chief Operating Officer of the Center, that he take over the operation of the café with the backing of an investor. Instead, Winter hired Shain

1. Unless otherwise noted, the following facts are taken from the parties' statements pursuant to Local Civil Rule 56.1. These are Defendant's Statement Pursuant to Local Rule 56.1 ("Def. 56.1 Stmt.") and Plaintiffs' Statement Pursuant to Local Rule 56.1 ("Pls. 56.1 Stmt.").

as the Center's employee to manage the Café as well as to be its *Mashgiach.*

In mid-May 2002, Bruce Slovin, Chairman of the Board of the Center, visited the Café, and suggested to Shain that he trim his beard. Shain explained that his religious practice forbids him to do so. Slovin responded by commenting that when he was a child he ate only kosher food and thought he would die if he ate non-kosher food, but when he grew up a friend convinced him to eat non-kosher food and he survived. Am. Compl. ¶ 17; Shain Affirmation 3; Otero Affidavit ¶ 2.

Slovin visited the Café again in June 2002 and criticized the appearance of some salads, and remarked to Shain that he should let Angela Otero, Shain's non-Jewish subordinate at the Café, dress food platters because, "as a non-Jew she knew more about food presentation." Shain Affirmation ¶ 7. Some time during the summer of 2002, Slovin allegedly came to the Café, pointed to Shain's *tzitzis* and said "I used to wear those when I was a child." Shain Affirmation ¶ 9.

From the beginning of Shain's employment at the Center, Philip Wilner, the manager of the Center gift shop, berated him for his supposedly unkempt appearance and that of the Café. Otero Affidavit ¶ 9–14. Wilner is an Orthodox Jew, but is not Hasidic. During the summer or fall of 2003, Shain alleges that Wilner's criticisms of his appearance and the appearance of the Café increased. At the same time, the Café's clientele increased substantially, especially its clientele of Hasidic Jews. Otero Affidavit ¶ 14–18. Wilner indicated to Otero that Slovin did not want Hasidic Jews coming to the Café and preferred a wealthier clientele that would donate money to the Center. Otero Affidavit ¶ 24.

In October 2002, Parnes allegedly overheard Slovin remark to Rabbi Joshua Plaut, the Executive Director of the Center, that Shain "looks sloppy with his *tzitzis*" and that he did not want anyone with a beard or *tzitzis* working in the Café. Am. Compl. ¶ 37; Parnes Affirmation ¶ 30. Parnes also heard Slovin tell Rabbi Plaut that the Orthodox rabbinical organizations that give *hechschers* (rabbinical approval indicating that food has been prepared in accordance with *kashruth* ) are thieves.

In December 2002, Slovin noticed two employees of one of the Center's partner organizations who were eating in the Café. Slovin approached the employees and spoke with them for a few minutes, then stood up and said in a loud voice: "I'm against organized religion." Shain Affirmation ¶ 13. He then walked over to Shain, demanded a glass of ice water and "gave [him] a dirty look." *Id.* When Shain asked one of the people to whom Slovin had been speaking what had happened, she told Shain that Slovin had criticized Shain's beard and told her that he intended to get a new caterer. *Id.*

In early January 2003, James Burke, a colleague of Ira Berkowitz, the Chief Financial Officer of the Center, told Shain that the Center intended to fire him whether or not it found a new caterer, but would keep Otero and the other Café employees. Shain Affirmation ¶ 15.[2] Around the same time, Placid Dingue, who worked for Mr. Berkowitz in the Center's business office, told Shain the Café was beginning to make money. Otero Affidavit ¶ 26. Shain spoke with Slovin and asked him about the Café's finances, explaining that Winter had meddled in a decisions about which vendors to use and that Burke had not given him the financial information he

---

2. Shain also testified that Burke told him the reason the Center was going to fire Shain was that "until the museum find[s] another rich person as chairman, we have to follow what [Slovin] says." Shain Deposition at 130.

needed to monitor the Café's profitability. Shain Affirmation ¶ 16.

On January 6, 2003, Berkowitz called Shain into a meeting with himself, Wilner, Burke and Winter. Berkowitz told Shain that Wilner would be supervising the Café from that point forward. Shain Affirmation ¶ 18. When Shain questioned the decision, Berkowitz yelled that he was about to fire Shain, and asked if Shain could work with Wilner. *Id.* Shain said that he could. *Id.* Wilner then announced that he wanted to change the music to music like that he played in the gift shop. *Id.* That music included women singing, which "Hasidic Jewish men are forbidden from listening to ... because it might give them improper thoughts about women other than their wives." *Id.* Shain alleges that Wilner made the suggestion to upset him. *Id.* After the meeting, Berkowitz, Burke and Wilner started taking food without paying. Otero Affidavit ¶ 27. Plaut also had the Café provide platters of food and charge it to the Center's account, and Burke told Otero that that food did not count toward the Café's profits. Otero Affidavit ¶ 28–29.

On April 2, 2003, the Center's Board of Directors had a meeting and voted to have RAM caterers take over the Café. Biguenet Declaration, Ex. Q. The minutes of the meeting noted that the Café was losing $65,000 to $70,000 per year. *Id.* On the same day, Shain closed the Café in anticipation of slow business preceding the Passover holiday. Three weeks later, around April 22, 2003, Shain came in to the Center during *Chol Hammoed* (the middle days of the eight-day holiday of Passover during which work is permitted) to unlock the Café for painters who were going to repaint it. Shain Affirmation ¶ 19. As the *Mashgiach*, charged with ensuring that no

unkosher food contaminated the Café, Shain apparently had the only key. Wilner demanded the key, but Shain explained that as *Mashgiach*, he could not relinquish it. *Id.* at ¶ 20–21; Am. Compl. ¶ 25.[3]

On April 29, 2003, the Tuesday after Passover ended, Berkowitz called Shain into his office, told him that the Center had a problem with the Café losing money and that they had to let him go, and took back the key to the Café. *Id.* at ¶ 23. Shain later learned that the Center brought in RAM Caterers to run the Café, and that their *Mashgiach* did not wear a beard. *Id.* at ¶ 24.

## B. Plaintiff Parnes

Bella Parnes is an Orthodox Jew, and accordingly dresses modestly, has covered her hair in public since she was first married, and keeps kosher. She also observes *Shabbat*, or Sabbath, which starts before sundown on Fridays. Keeping *Shabbat* means Parnes may not cook, use money, or do other kinds of work after *Shabbat* has begun. This entails leaving work early on Fridays, especially during the shorter days in the winter.

In December 2000, Parnes was hired as a Public Relations Associate by Barbara Goldberg, then the Director of Public Relations for the Center. In September 2002, Rabbi Plaut was appointed Executive Director of the Center, and Parnes alleges that Slovin became much more involved in the day-to-day operations of the Center. Parnes Affirmation ¶¶ 24–25. Later that month, Barbara Goldberg, an Orthodox Jew, was fired from her position as Director of Public Relations and replaced by Steven Greene, who is not Orthodox. Parnes Affirmation ¶ 31.

---

**3.** We recognize that the time sequence in this paragraph is problematic. However, it is reflective of the parties' submissions. At this time, it is not necessary to resolve the apparent illogic of the sequence.

Sometime in December 2002, Max Gershenoff was hired as an assistant to Rabbi Plaut. When he met Parnes, he shook her hand and said sarcastically "I didn't know if you were a *Shomer Negiah*" (a person who observes the Orthodox rule that men and women may not touch members of the opposite sex except for their spouses). Parnes Affirmation ¶ 33. One afternoon soon after Gershenoff was hired, Slovin spoke "so loudly that the entire office could hear him," asking Gershenoff to pick him up a bacon, lettuce, and tomato sandwich "with extra bacon." Am. Compl. ¶ 40; Parnes Affirmation ¶ 35. Gershenoff then approached Parnes, and, "in a snide and nasty tone," asked, "Did you hear that, *extra bacon,*" and laughed sarcastically. *Id.* Bacon and other forms of pork are not kosher.

On Friday, January 3, 2003, Greene e-mailed Parnes around noon to ask her to do a project. Feinberg Affirmation, Ex. EE. Parnes responded by explaining that she had to leave by one o'clock to prepare for the Sabbath. Greene responded in turn that he understood that Parnes was observed the Sabbath but that her responsibilities would have to change. When Parnes asked what Greene meant, he wrote that they would discuss the subject the following week. Parnes Affirmation ¶ 36. On January 8, 2003, Greene asked Rabbi Plaut to remove Parnes from his department because he felt she lacked the required professional skills. Parnes Affirmation ¶ 37; Feinberg Affirmation, Ex. FF. Two days later, Plaut held a meeting with Parnes, Berkowitz and Gershenoff, where he removed Parnes from Greene's department, and told her that her salary would be reduced. Parnes Affirmation ¶ 38.[4]

Parnes started working in the Center library with Rachel Cohen, an Orthodox Jewish woman. Cohen told Parnes that Slovin had told her not to cover her hair. Parnes Affirmation ¶ 39. A few weeks after Parnes started at the library, she was reassigned to the Development Department, under Suzanne Maltz. Parnes Affirmation ¶ 40. A month later, Maltz was replaced by Sandi Rubin. Parnes Affirmation ¶ 41. On March 26, 2003, Rubin sent an e-mail to Rabbi Plaut criticizing Parnes's work performance and qualifications. Feinberg Affirmation Ex. XX. Parnes alleged that, in private, Rubin told her it was Slovin's idea to fire her, not her own. Parnes Affirmation ¶ 41.

On April 4, 2003, Rabbi Plaut sent a memo to Slovin explaining that he planned to terminate Parnes in light of the "upgrading of the Development Department's secretary position to development assistant," and "pursuant to [Slovin's] direction" on March 31, 2003 and his earlier requests in December 2002 and again before he left for a vacation in March 2003. Feinberg Affirmation, Ex. RR. The Center terminated Parnes on April 7, 2003 and replaced her with Margery Gerstein, a non-Orthodox woman. Parnes Affirmation ¶¶ 42–43.

## DISCUSSION

### I. Summary Judgment

A motion for summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the evidence submitted must be viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While credibility determinations,

---

4. Parnes testified that Berkowitz whispered to her that her salary would not, in fact, be reduced, and that it was not reduced. Parnes Deposition at 59.

weighing evidence and drawing legitimate inferences from facts are functions that the Court must leave to the jury, if the non-moving party does not present evidence from which a reasonable jury could return a favorable verdict, then summary judgment is appropriate. *See, e.g., Golden Pacific Bancorp. v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir.2004).

## II. Employment Discrimination

Although plaintiffs assert claims under Title VII, the New York State Human Rights Law, and the New York City Human Rights Law, employment discrimination claims under all these statutes are analyzed under the three step burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Brennan v. Metropolitan Opera Assoc., Inc.*, 192 F.3d 310, 316–17 n. 2 (2d Cir.1999); *Curley v. St. John's Univ.*, 19 F.Supp.2d 181, 187 (S.D.N.Y.1998). In the first step, we inquire "whether the plaintiff has successfully asserted a prima facie case of ... discrimination against ... defendants. A plaintiff may rely on direct evidence of what the defendant did and said in satisfying her initial burden under *McDonnell Douglas.*" *Back v. Hastings on Hudson Union Free School Dist.*, 365 F.3d 107, 123 (2d Cir.2004) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 77 (2d Cir.2001)) (internal quotation marks omitted).

In order to establish a prima facie case of discriminatory discharge, the plaintiff must establish that "(1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class." *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir.2005)

(citing *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir.2001)).

In assessing the circumstances surrounding a termination of employment, we must "be alert to the fact that employers are rarely so cooperative as to include a notation in the personnel file that their actions are motivated by factors expressly forbidden by law" and so employees are "usually constrained to rely on circumstantial evidence." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994) (citations and quotation marks omitted). "Circumstances contributing to a permissible inference of discriminatory intent may include ... the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; ... or the sequence of events leading to the plaintiff's discharge." *Id.* (citations omitted). The burden of proof an employment discrimination plaintiff must meet to survive a summary judgment motion at the prima facie stage is *de minimis*. *Id.* (citations omitted).

Once a plaintiff makes out a prima facie case of discrimination, we proceed to the second step of the burden-shifting framework, in which the defendants "have the burden of showing a legitimate, nondiscriminatory reason for their actions. In order to prevent summary judgment in favor of the plaintiff at this stage, that explanation must, if taken as true, 'permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Back*, 365 F.3d at 123 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

Finally, we continue to the third step of the burden-shifting framework, in which plaintiff "has the opportunity to prove 'by a preponderance of the evidence that the legitimate reasons offered by the defen-

dant were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). In order to defeat summary judgment, the plaintiff "is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Id.* (quoting *Holtz,* 258 F.3d at 78).

In *Back,* the Second Circuit elaborated on plaintiff's ultimate burden of persuasion:

> Regardless of whether the plaintiff can prove pretext, she or he bears the ultimate burden of persuasion, and must adduce enough evidence of discrimination so that a rational fact finder can conclude that the adverse job action was more probably than not caused by discrimination. *See St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742 (holding that "rejection of the defendant's proffered reasons [for the adverse action] will *permit* the trier of fact to infer the ultimate fact of intentional discrimination" but does not *"compel* [ ]" this inference); *Fisher v. Vassar College,* 114 F.3d 1332, 1336 (2d Cir.1997) (in banc) (stating that, after the defendant proffers a legitimate, non-discriminatory reason for the action, "[t]he question becomes the same question asked in any other civil case: Has the plaintiff shown, by a preponderance of the evidence, that the defendant is liable for the alleged conduct?").

To meet his or her ultimate burden, the plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more. *See Holtz,* 258 F.3d at 79 (citing *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995)). And as with the first stage of *McDonnell Douglas,*

[plaintiff] is not required to provide evidence that similarly situated [individuals who are not members of her protected class] were treated differently. *Holtz,* 258 F.3d at 78 ("[J]ust as evidence of disparate treatment is not an essential element of a prima facie case of discrimination, such evidence is also not always necessary at the final stage of the *McDonnell Douglas* analysis." (citation omitted)). And unless the defendants' proffered nondiscriminatory reason is "dispositive and forecloses any issue of material fact," summary judgment is inappropriate. *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 135 (2d Cir.2000); *see also Holtz,* 258 F.3d at 79 (noting that the issue of pretext "is ordinarily for the jury to decide at trial rather than for the court to determine on a motion for summary judgment").

*Back,* 365 F.3d at 123–24.

### III. Religious Discrimination

We find that both plaintiffs have established prima facie cases of religious discrimination. Both Shain and Parnes (1) are Orthodox Jews, a protected class; (2) have offered sufficient evidence to permit a jury finding that they were performing their duties satisfactorily; (3) were terminated, an adverse employment action; and (4) presented evidence both that the decision to terminate them was influenced by Mr. Slovin and that he had expressed hostility toward Orthodox Jews, giving rise to an inference of discrimination.

 Defendant offers several arguments in support of a contrary conclusion, which we now address. First, defendant argues that plaintiffs "have no evidence that the alleged discriminatory acts were in any way connected with their dismissals (the adverse employment action), a showing that is required to establish a prima facie case." Support Mem. at 9 (citing

*Lynch v. Pathmark Supermarkets*, 987 F.Supp. 236, 243 (S.D.N.Y.1997); *Rivera v. Potter*, No. 03 Civ.1991, 2005 WL 236490, at *5 (S.D.N.Y. Jan.31, 2005)). Although defendant would rely on *Lynch* and *Rivera*, the plaintiffs in those cases did not proffer any evidence that showed the harassment they described played any part in their dismissals. *Lynch*, 987 F.Supp. at 243; *Rivera*, 2005 WL 236490, at *5. Here, however, plaintiffs have offered ample evidence connecting Slovin's alleged hostility toward Orthodox Jews to their termination. Without drawing any conclusions about the truth of plaintiffs' allegations, we note that they have produced evidence that Slovin expressed hostility towards plaintiffs' religious practices, stated that he did not want Orthodox Jews working in the Center, and exerted his power to have plaintiffs terminated. We further note that discovery is not yet completed, and that "caution should be exercised in granting summary judgment where state of mind is in issue or when the party opposing the motion has been denied relevant discovery." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.1983) (citing *Landmark Land Company v. Sprague, et al.*, 701 F.2d 1065 (2d Cir.1983); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980)).

Defendant also asserts that Parnes's prima facie case relies entirely on five distinct incidents, and attempts to demonstrate that Parnes has failed to state a prima facie case by rebutting each of those incidents.[5] We agree with defendant that Mr. Gershenoff's comment about Parnes being *Shomer Negiah* is not attributable to the Center or connected to her termination.

We also agree that Rabbi Plaut's warning Parnes not to eat a non-kosher cake does not reflect discriminatory behavior. However, we cannot categorically conclude that the same is true of the other alleged incidents. Slovin's alleged yelling about "extra bacon" within earshot of Parnes is similar to his alleged shouting that he is opposed to organized religion near Slovin, and arguably suggests anti-Orthodox prejudice. Greene's alleged reaction to Parnes's refusal to work on Friday afternoon—recommending that she be removed from his department—is arguably evidence of anti-Orthodox discrimination that led to Parnes's termination. The same may be true, although not necessarily, of Rabbi Plaut's considering a policy of making employees who observe *Shabbat* make up the time they miss, along with Slovin's alleged comments about observant Jews. In sum, we conclude that both Shain and Parnes have made the *de minimis* showing necessary to establish prima facie cases of religious discrimination in connection with their terminations.

■ Defendant also argues that it has articulated legitimate business reasons for terminating plaintiffs' employment and that plaintiffs cannot prove that those reasons were pretexts for discrimination. Support Mem. at 15. With respect to Shain, defendant asserts that there is "incontrovertible documentary evidence that the Center decided to hire an outside caterer to run the Café because it believed it was losing money running it itself." Support Mem. at 17. Those documents are, however, controverted by evidence that the Center did not feel the Café needed to

---

5. The five incidents are (1) Gershenoff's comment to Parnes that he "didn't know if you were *Shomer Negiah*;" (2) the "extra bacon" incident; (3) Greene's request to Parnes that she undertake a project whose completion that day would have required her to violate her Sabbath observance; (4) an incident in which Rabbi Plaut allegedly warned Parnes not to eat a cake because it was not kosher; and (5) a suggestion by Rabbi Plaut, never implemented, that staff who left early on Fridays might have to make up that time. Support Mem. at 9–10.

be profitable, that it would have to pay a caterer a fee equivalent to its annual losses to compensate for the unprofitability of running the Café, and by evidence that the Café was, in fact, profitable. Shain Affirmation ¶¶ 25–30. This evidence would support Shain's contention that the alleged unprofitability of the Café was, in fact, a pretext for dismissing him.

As for Parnes, defendant explains that Parnes lacked the necessary qualifications for her job in the Public Relations department, and that she admitted as much in her deposition. Parnes Tr. 45, 51. Defendant further urges that we reject evidence presented in Parnes's affidavit supporting a contention that she was qualified as inconsistent with her deposition testimony. Reply Mem. at 7 (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir.1997); *Macaluso v. Herman Miller, Inc.*, No. 01 Civ. 11496, 2005 WL 563169, at *7 (S.D.N.Y. March 10, 2005)). In fact, Parnes did not testify that she was unqualified for her position. Rather, she admitted that Greene had asked her to do certain tasks which she was unqualified to do because they had previously been the responsibility of her supervisor, Barbara Goldberg. Defendant also argues that Parnes cannot show that Sandi Rubin's rationale for terminating Parnes's employment in the Development Department was pretext. Opp. Mem. at 16. But Parnes alleges that Rubin told her the termination was Slovin's idea, and Rabbi Plaut's April 4, 2003 e-mail to Slovin corroborates that allegation, referring to a request by Slovin to terminate Parnes in December 2002, around the time of his "extra bacon" comment and before the Center began transferring Parnes between departments.

In sum, there are material issues of fact as to whether the Center's reasons for terminating Shain and Parnes were pretextual. We therefore cannot grant summary judgment in favor of defendant on plaintiffs'

claims that their terminations were motivated by religious discrimination.

## IV. Age and Sex Discrimination

We also find that Parnes has failed to state a prima facie case of age or sex discrimination. Parnes simply adduces no evidence that could give rise to an inference of age or sex discrimination. Her allegations that Rabbi Plaut hired young men—Gershenoff, Greene, and Eric Katzman, her replacement in the Public Relations department—and that Rabbi Plaut, Greene, and Gershenoff had a camaraderie that did not include Parnes, are insufficient to give rise to such an inference. Parnes Tr. At 216–17, 222.

Furthermore, we hold that plaintiffs cannot survive summary judgment on their hostile work environment claims because they have failed to "adduce evidence sufficient to permit a reasonable jury to conclude that [their] workplace was permeated with discriminatory intimidation, ridicule, and insult ... sufficiently severe or pervasive to alter the conditions" of their employment. *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir.2004) (internal quotation marks and citations omitted). Title VII "does not establish a 'general civility code' for the American workplace. Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." *Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *Holtz*, 258 F.3d at 75). The sporadic inappropriate comments aimed at plaintiffs fall far short of the standard for a hostile work environment.

## CONCLUSION

For the foregoing reasons, we grant defendant's motion for summary judgment

against plaintiffs' hostile work environment claim and against Parnes's claims for age and sex discrimination. We deny defendant's motion for summary judgment against plaintiffs' wrongful termination claim.

**IT IS SO ORDERED.**